**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **SHANE PINEDO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-14-CV-195-KC** |
| | § | |
| **ALLIANCE INSPECTION** | § | |
| **MANAGEMENT, LLC; and** | § | |
| **AUTOCOMM, INC. d/b/a A.I.M.** | § | |
| **AUTOCOMM,** | § | |
| | § | |
| **Defendants**. | § | |

## ORDER

On this day, the Court considered Defendants' Motion for Summary Judgment and Brief in Support ("Defendants' Motion"), ECF No. 28, and Plaintiff's Amended Motion for Summary Judgment and Memorandum in Support ("Plaintiff's Motion"), ECF No. 30, in the above-captioned case (the "Case"). After due consideration, the Court **GRANTS** Defendants' Motion in part, and **DENIES** Plaintiff's Motion in its entirety.

## I.   BACKGROUND

### A.   Factual Background

Unless otherwise indicated, the following facts are undisputed. Plaintiff Shane Pinedo ("Plaintiff") was hired by Defendant AutoComm, Inc. ("AutoComm") in July 2013. *See* Defs.' Proposed Undisputed Facts in Supp. of their Mot. for Summ. J. ¶ 1 ("Defendants' Facts"), ECF No. 28-1; Pl.'s Resp. to Defs.' Proposed Undisputed Facts ¶ 1 ("Plaintiff's Response to Defendants' Facts"), ECF No. 36-1. The record is less than clear on the relationship between AutoComm and Defendant Alliance Inspection Management, LLC ("Alliance") (collectively,

"Defendants").[1]  However, Defendants represent that AutoComm is a wholly owned subsidiary of Alliance, and that both entities are actively engaged in the business of inspecting new and pre-owned vehicles throughout the United States.  *See* Defs.' Mot. 7 n.2.[2]

Defendants initially hired Plaintiff as an inspector for their El Paso facility (the "River Yard Facility").  Defs.' Facts ¶ 1; Pl.'s Resp. to Defs.' Facts ¶ 1.  At some point thereafter, Defendants promoted Plaintiff to the position of facility lead.  Defs.' Facts ¶ 3; Pl.'s Resp. to Defs.' Facts ¶ 3.  In this capacity, Plaintiff was "in charge of everybody at the facility," and therefore had the authority to discipline other employees.  Defs.' Facts ¶¶ 4-5; Pl.'s Resp. to Defs.' Facts ¶¶ 4-5.  His primary responsibility was to ensure that the inspectors properly examined railcars that entered the United States from Mexico.  Defs.' Facts ¶ 6; Pl.'s Resp. to Defs.' Facts ¶ 6.  During Plaintiff's employment, John Ozuna ("Ozuna") acted as Plaintiff's supervisor.  Defs.' Facts ¶ 7; Pl.'s Resp. to Defs.' Facts ¶ 7.

One of the employees that Plaintiff worked with at the River Yard Facility was Alejandro Santos ("Santos").  Defs.' Facts ¶ 24; Pl.'s Resp. to Defs.' Facts ¶ 24.  The parties dispute almost everything that occurred between Plaintiff and Santos.  Specifically, while Defendants claim to possess "no evidence" that Santos engaged in any inappropriate behavior towards Plaintiff, *see* Defs.' Resp. to Pl.'s Proposed Undisputed Facts ¶¶ 5-10 ("Defendants' Response to Plaintiff's

---

[1] As the Court discusses in detail below, the parties have been cavalier in the manner in which they have referred to the two Defendants in this Case.  While all agree that Plaintiff was at the very least employed by AutoComm, *see* Defs.' Facts ¶ 1; Pl.'s Resp. to Defs.' Facts ¶ 1, Defendants contend in a footnote that Alliance "has been improperly named" because it "was not Plaintiff's employer and therefore . . . cannot be sued in the capacity in which it has been sued."  *See* Defs.' Mot. 5 n.1.  Despite raising this argument for the first time in the context of a summary judgment motion, Defendants fail to provide any citation to the record supporting their position that Plaintiff was never employed by Alliance.  *See* Defs.' Facts ¶ 2.  Similarly, although the record in this Case is replete with references to Alliance, Plaintiff also fails to cite any evidence in support of his position that Alliance acted as his employer.  *See* Pl.'s Resp. to Defs.' Facts ¶ 2.  Because neither Plaintiff nor Defendants have sufficiently developed the record on this point, the Court uses the term "Defendants" when referring to Plaintiff's employer.  In doing so, the Court makes no finding on whether Alliance is "improperly named" in the Case.

[2] The Court uses the pagination assigned by the Court's electronic docketing system for all citations with two exceptions:  When citing to Plaintiff's and Ozuna's deposition testimony, the Court uses the original pagination found in the deposition transcripts.

Facts"), ECF No. 31,[3] Plaintiff contends that Santos harassed him on a daily basis.  *See* Pl.'s Proposed Undisputed Facts ¶¶ 5-10 ("Plaintiff's Facts"), ECF No. 30.[4]

Specifically, Plaintiff introduced evidence that Santos often referred to him by the pet name "Patito," and told Plaintiff that he "wanted to see Patito fuck."  Pl.'s Facts ¶ 8.  Santos also allegedly called Plaintiff a "joto" and a "marica" – which are derogatory Spanish slang terms meaning "gay" and "faggot" in English.  *Id.* ¶ 9.  In addition to these comments, Plaintiff testified that Santos threatened him with rape on a daily basis, and, on at least one occasion, invited Plaintiff to "come [and] play with his penis" while simultaneously gesturing at his genitals.  *Id.* ¶¶ 6-7; *see also* Sworn Aff. of David Castaneda ¶ 6, Pl.'s Mot. Ex. D ("Castaneda Affidavit"), ECF No. 30-2.  According to Plaintiff, his coworkers observed Santos's conduct, and even drew caricatures on a dry-erase board depicting Plaintiff being sodomized by Santos.  Pl.'s Facts ¶ 14.

Plaintiff testified that he did not report Santos's behavior to his superiors because he was embarrassed by the situation.  *See* Pinedo Dep. 30:6-10, Jan. 23, 2015.[5]  In addition, though Plaintiff's position as facility lead granted him the power to "write up" other employees, Plaintiff never disciplined Santos or any other worker at the River Yard Facility.  *See id.* at 15:11-16.

In the fall of 2013, Plaintiff was involved in a series of work-related incidents that Defendants assert ultimately served as the basis for his termination.  *See* Pl.'s Facts ¶ 36; Defs.' Resp. to Pl.'s Facts ¶ 36.  First, at some point in November 2013, Ozuna discovered a broken

---

[3] Defendants' Response to Plaintiff's Facts is set forth in the body of Defendants' responsive pleading rather than as a separate attachment.  *See* Defs.' Resp. to Pl.'s Am. Mot. for Summ. J. and Mem. in Supp. 5-9, ECF No. 31.

[4] Plaintiff's Facts are set forth in the body of Plaintiff's Motion rather than as a separate attachment.  *See* Pl.'s Mot. 6-10.

[5] Portions of Plaintiff's deposition are attached to Defendants' Motion, Plaintiff's Motion, and Plaintiff's Response to Defendants' Motion for Summary Judgment and Brief in Support ("Plaintiff's Response"), ECF No. 36.  The Court has culled the relevant pages, and for ease of reference cites them as "Pinedo Deposition."

desk in the River Yard Facility.  Pl.'s Facts ¶ 19; Defs.' Resp. to Pl.'s Facts ¶ 19.  Ozuna asked

Plaintiff if he knew who broke the desk, to which Plaintiff replied that he did not.  Pl.'s Facts ¶

19; Defs.' Resp. to Pl.'s Facts ¶ 19.  However, other employees at the River Yard Facility,

including Santos, implicated Plaintiff as the individual responsible.  *See* Ozuna Dep. 65:3-25,

Jan. 23, 2015.[6]

Second, on November 23, 2013, Plaintiff was involved in a verbal altercation with a

United States Customs official that could have subjected Defendants' to a fine.  Defs.' Facts ¶ 8;

Pl.'s Resp. to Defs.' Facts ¶ 8.  A United States Customs supervisor complained to Ozuna

regarding Plaintiff's behavior.  Defs.' Facts ¶ 9; Pl.'s Resp. to Defs.' Facts ¶ 9.  When Ozuna

confronted Plaintiff with the allegations, Plaintiff admitted that an altercation had occurred, and

also conceded that he had failed to follow the proper procedures governing the railcar inspection

process.  Defs.' Facts ¶ 10; Pl.'s Resp. to Defs.' Facts ¶ 10.  According to Plaintiff, at the time

the incident occurred, Ozuna told him that he would not be disciplined.  *See* Pl.'s Resp. to Defs.'

Facts ¶ 7.

Third, from November 27, 2013, to December 2, 2013, Plaintiff failed to timely submit

his "daily facility reports."  Defs.' Facts ¶ 11; Pl.'s Resp. to Defs.' Facts ¶ 11.  As facility lead,

Plaintiff had the primary responsibility for transmitting daily reports to Defendants' corporate

offices.  Defs.' Facts ¶ 13; Pl.'s Resp. to Defs.' Facts ¶ 13.  When Defendants confronted

Plaintiff regarding the missing reports, Plaintiff initially characterized the incident as an "honest

mistake."  Defs.' Facts ¶ 12; Pl.'s Resp. to Defs.' Facts ¶ 12.  However, in a December 4, 2013,

email to Defendants' West Regional Director Adam Degner ("Degner"), Plaintiff states that he

was absent from work on November 28, 2013, and November 29, 2013, and therefore could not

---

[6] Portions of Ozuna's deposition are attached to Defendants' Motion, Plaintiff's Motion, and Plaintiff's Response.
The Court has culled the relevant pages, and for ease of reference cites them as "Ozuna Deposition."

send any daily reports for those days.  *See* email from Shane Pinedo to Adam Degner (Dec. 4, 2013, 10:47 MST), Pinedo Dep. Ex. 6, Defs.' Mot. ("Degner Email"), ECF No. 28-4.  Plaintiff further states that when he returned to work on November 30, 2013, he encountered problems with the software program that he used to transmit the data.  *Id.*  Plaintiff claims that he called Ozuna to inform him of the issue, and "contacted [Defendants'] help desk immediately on Monday December 2nd [to] resolve[] the problem."  *Id.*

Lastly, on December 3, 2013, Marcos Villareal ("Villareal"), a representative of one of Defendants' clients, stopped by the River Yard Facility and observed pictures depicting scantily clad women posted on the walls.  Defs.' Facts ¶¶ 17-18; Pl.'s Resp. to Defs.' Facts ¶¶ 17-18; *see also* Pinedo Dep. Ex. 5, Defs.' Mot., ECF No. 28-4.  Plaintiff admits that he used his work computer to print out the pictures and further admits to posting the images on the walls of the River Yard Facility.  Defs.' Facts ¶¶ 14, 20; Pl.'s Resp. to Defs.' Facts ¶¶ 14, 20.  The parties disagree, however, on the events that preceded Villareal's discovery.  Plaintiff's version, which he corroborates with an affidavit from one of his former co-workers, is that Ozuna gave all the employees at the River Yard Facility permission to post pictures of naked women months before Villareal discovered the images in question.  Pl.'s Facts ¶ 15.  Shortly thereafter, some of Plaintiff's co-workers posted clippings from a Juarez newspaper depicting fully nude women on the walls of the River Yard Facility.  *Id.* ¶ 16; *see also* Pinedo Dep. 50:8-24.  Ozuna allegedly saw these photographs, and laughed at them.  Pl.'s Facts ¶ 17.  Plaintiff claims that when other employees pressured him to post pictures of his own, he replaced the nude pictures with images of clothed women.  *Id.* ¶ 18; *see also* Pinedo Dep. 50:8-24.  For their part, Defendants expressly deny that Ozuna gave employees permission to post pictures of naked women, and further claim to have "no knowledge of any nude pictures of women posted by other employees at the River

Yard [F]acility." Defs.' Resp. to Pl.'s Facts ¶¶ 15-16.

While the parties agree that Defendants terminated Plaintiff on December 4, 2013, Pl.'s Facts ¶ 36; Defs.' Resp. to Pl.'s Facts ¶ 36, they disagree on almost everything else that transpired over the days leading up to Plaintiff's discharge. According to Plaintiff, after Villareal discovered the photographs on December 3, 2013, Ozuna came to the River Yard Facility "the same day" and suspended him until further notice. *See* Pinedo Dep. 61:2-19. Plaintiff testified that at some point after he was suspended, but before he was notified of his termination, he made two phone calls to Degner. *Id.* at 34:15-25, 35:1-4, 35:13-18, 38:7-12. During the first phone call, Plaintiff claims that he did not mention anything regarding "discrimination," and instead wanted to give Degner his side of the story regarding the November 23, 2013, incident with the United States Customs official. *Id.* at 35:13-24. Shortly thereafter, however, Plaintiff called Degner a second time and "reported to him that [he] was being discriminated against." *Id.* at 30:19-25; *see also id.* at 36:14-20, 37:16-25. According to Plaintiff, "before [he] could even keep going on with [his] sentences," Degner cut him off and told him that he needed to contact Lisa Deary ("Deary") in Defendants' human resources department if he wished to file a discrimination complaint. *Id.* at 30:24-31:5; *see also id.* at 37:16-38:6. That same day, Plaintiff called Deary and "just informed her that [he] felt [he] was being discriminated against." *Id.* at 33:22-23; *see also id.* at 38:13-23. Deary allegedly responded by requesting that Plaintiff write up a detailed report of exactly what incidents he felt constituted discrimination. *Id.* at 33:15-24. Plaintiff never filed a report, and received notice of his termination on "exactly the next day" following his discrimination complaint. *Id.* at 34:2-14.

Defendants deny that Plaintiff ever called Degner, Deary, or any other human resources manager to report discrimination or harassment during his employment. *See* Defs.' Resp. to Pl.'s

Facts ¶¶ 20-21, 23.  They further assert that Ozuna never "suspended" Plaintiff; he simply terminated him on December 4, 2013, as a result of the numerous employment-related issues that had occurred during Plaintiff's short tenure as facility lead.  *Id.* ¶ 22.

Although the parties disagree over the events that occurred prior to Plaintiff's discharge, they agree that on or about December 4, 2013, Ozuna drafted four separate "Employee Warning Notices" pertaining to Plaintiff's work performance.  Pl.'s Facts ¶¶ 29-31, 34; Defs.' Resp. to Pl.'s Facts ¶ 29-31, 34; *see also* Pinedo Dep. Ex. 4 at 17-20, Defs.' Mot., ECF No. 28-4.[7]  Each notice corresponds to one of the events that occurred in the weeks prior to Plaintiff's discharge – namely, the damaged desk, the November 23, 2013, argument with the United States Customs official, the failure to timely transmit daily reports, and the photographs of scantily-clad women. Pinedo Dep. Ex. 4 at 17-20.  Though Ozuna appeared to draft the notices contemporaneously, all of them are marked as "Final Warning[s]," and indicate that the consequences of a further violation will be either suspension or termination.  *Id.*

Plaintiff signed three of the notices, and by his signature, indicated that he "agree[d] with [the] Employer's statement."  *See* Pinedo Dep. Ex. 4 at 17-18, 20.  However, Plaintiff's signature does not appear on the notice issued in connection with the damaged desk.  *See* Pinedo Dep. Ex. 4 at 19.  Instead, that particular notice is signed by two individuals:  Ozuna, as Plaintiff's supervisor, and Santos, as a "witness" to the incident.  *Id.*  Although the write up itself is dated December 3, 2013, Ozuna's and Santos's signatures are dated November 4, 2013.  *Id.*

### B.  Procedural History

On April 21, 2014, Plaintiff filed suit against Alliance in the 171st District Court of El Paso County, Texas.  *See* Pl.'s Original Pet. and Request for Disclosure, Notice of Removal 8-12

---

[7] While both Plaintiff and Defendants attach the employee warning notices to their respective motions for summary judgment, the Court cites to the notices as they appear in Defendants' Motion using the pagination assigned by the Court's electronic docketing system.

("Original Petition"), ECF No. 1.  Shortly thereafter, on May 20, 2014, Plaintiff filed an

amended petition adding AutoComm as a Defendant in the Case.  *See* Pl.'s First Am. Pet. and

Request for Disclosure, Notice of Removal 24-29 ("Amended Petition"), ECF No. 1.[8]  In his

Amended Petition, Plaintiff brings claims against Defendants for sexual harassment and unlawful

retaliation.  *See* Am. Pet ¶¶ 6-21.  The Amended Petition contains no statutory references, and

thus does not specify whether Plaintiff's claims arise under the Texas Commission on Human

Rights Act ("TCHRA"), Title VII of the Civil Rights Act, or both.  *See generally id.*

On May 23, 2014, Defendants removed the Case to this Court on the basis of diversity

jurisdiction.  *See* Notice of Removal 1-4.  Following the conclusion of discovery, the parties filed

cross motions for summary judgment.  *See* Defs.' Mot.; Pl.'s Mot.  Defendants responded to

Plaintiff's Motion on March 9, 2015, and Plaintiff responded to Defendants' Motion on March

12, 2015.  *See* Defs.' Resp. to Pl.'s Am. Mot. for Summ. J. and Mem. in Supp. ("Defendants'

Response"), ECF No. 31; Pl.'s Resp. to Defs.' Mot. for Summ. J. and Br. in Supp. ("Plaintiff's

Response"), ECF No. 36.  Defendants then replied to Plaintiff's Response on March 19, 2015,

and Plaintiff replied to Defendants' Response on March 25, 2015.  *See* Defs.' Reply in Supp. of

Defs.' Mot. for Summ. J. and Br. in Supp. ("Defendants' Reply"), ECF No. 37; Pl.'s Reply to

Defs.' Resp. to Pl.'s Am. Mot. for Summ. J. and Mem. in Supp. ("Plaintiff's Reply"), ECF No.

42.  Both Plaintiff's Motion and Defendants' Motion are fully briefed and ripe for resolution.

## II.   DISCUSSION

### A.   Standard

A court must enter summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus.,*

---

[8] The Amended Petition is the operative complaint in this Case.

*Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing

9

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

> ### B.    Defendants' Motion

As noted above, the parties in the Case filed cross-motions for summary judgment.  *See* Defs.' Mot.; Pl.'s Mot.  The Court first analyzes Defendants' Motion.  As a result, for the purposes of this section only, the Court resolves all factual disputes and draws all inferences in Plaintiff's favor as non-movant.  *See Little*, 37 F.3d at 1075; *Man Roland*, 438 F.3d at 478-79.

> ### 1.    Plaintiff's Title VII retaliation claim

Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claim because there is no evidence that Plaintiff ever complained of sexual harassment during his employment, and the record establishes that Plaintiff was terminated for engaging in numerous incidents of work-related misconduct.  *See* Defs.' Mot. 17-18.  Plaintiff responds that while disciplinary issues may have led to his initial suspension, he was not terminated until after he raised the issue of potential discrimination with Defendants' management and human resources personnel.  *See* Pl.'s Resp. 20-28.

Title VII's anti-retaliation provision makes it unlawful for an employer to retaliate against an employee who opposes an employment practice prohibited under Title VII.  *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489 (5th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)).  Where, as here, "direct evidence of retaliation is unavailable, the familiar *McDonnell Douglas* burden-shifting framework applies."  *See Ogletree v. Glen Rose Indep. Sch. Dist.*, 443 F. App'x 913, 917 (5th Cir. 2011); *see also Davis*, 765 F.3d at 489.  Under that framework, Plaintiff bears the initial

burden of establishing a prima facie case of retaliation. *Davis*, 765 F.3d at 489. This requires Plaintiff to show (1) that he participated in an activity protected by Title VII, (2) that Defendants took an adverse employment action against him, and (3) that a causal connection exists between the protected activity and the materially adverse action. *Id.* at 489-90. If Plaintiff successfully establishes all elements of his prima facie case, "'the burden shifts to [Defendants] to state a legitimate, non-retaliatory reason for [their] decision.'" *Id.* at 490 (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388-89 (5th Cir. 2007)). Finally, if Defendants come forward with a non-discriminatory reason for the adverse employment action, "'the burden shifts back to [Plaintiff] to demonstrate that [Defendants'] reason is actually a pretext for retaliation.'" *Id.* (quoting *LeMaire*, 480 F.3d at 388-89); *see also Ogletree*, 443 F. App'x at 917.

Here, the parties dispute whether Plaintiff established the first element of his prima facie case – namely, the existence of a protected activity. Plaintiff contends that his December 3, 2013, phone calls to Degner and Deary constitute protected activities under Title VII. *See* Pl.'s Resp. 20-22. Defendants argue that, to the extent these phone calls even occurred at all, they consisted of only passing and vague references to "discrimination," which are insufficient to constitute protected opposition as a matter of law. *See, e.g.*, Defs.' Mot. 17.

Under Title VII, an employee engages in a protected activity when he opposes "'any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceedings, or hearing under Title VII.'" *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (quoting *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003)); *see also* 42 U.S.C. § 2000e-3(a). While a complaint need not use any magic words to qualify for protection under the statute, it "must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown*,

11

406 F. App'x at 840.  In this vein, the Fifth Circuit has "consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity."  *Davis v. Dall. Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (collecting cases).

The Fifth Circuit had occasion to address one such vague complaint in *Brown v. United Parcel Services, Inc.*, 406 F. App'x 837 (5th Cir. 2010).  There, an African American plaintiff filed several union grievances against his white supervisor.  *Id.* at 838.  These grievances concerned a variety of work-related issues, including unfair work distribution, unpaid overtime, and selective enforcement of a lunch policy.  *Id.*  In one of the grievances, the plaintiff stated that the "same rules should apply to all drivers with no exceptions," and noted that he felt "discriminated upon by [his supervisor] because of his actions."  *Id.*  In affirming the district court's grant of summary judgment in favor of the employer, the Fifth Circuit held that the plaintiff's express reference to discrimination was insufficient to bring his complaint within Title VII's purview because the plaintiff "did not complain about race, color, religion, sex, or national origin discrimination."  *Id.* at 840.

The Fifth Circuit reached a similar conclusion in *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913 (5th Cir. 2006).  There, the plaintiff testified during her deposition that she reported "harassment" to her employer.  *Id.* at 916.  The Fifth Circuit held that the district court properly granted summary judgment on the plaintiff's Title VII retaliation claim because the plaintiff "ha[d] not demonstrated that she put the employer on notice that her complaint was based on racial or sexual discrimination."  *Id.*

Applying these standards here, the Court finds that Plaintiff's vague and unadorned references to possible "discrimination" are nearly identical to the complaints in *Brown* and

*Harris-Childs*.  First, with respect to Plaintiff's phone call with Degner, Plaintiff testified that the sum and substance of his conversation was that he "told [Degner] that [he] was being discriminated against and there was [*sic*] some problems that [he] felt [he] was having."  *See* Pinedo Dep. 37:16-38:6; *see also id.* at 30:19-25, 36:14-20.  Plaintiff presents no evidence that he ever mentioned that he was being sexually harassed, or conveyed his belief that he was being treated less favorably because of his sex or gender.  Indeed, the exact opposite is true:  Plaintiff expressly testified that he never reported Santos's comments to any of Defendants' managers or human resources personnel.  *Id.* at 30:6-10.  Ultimately, Plaintiff's vague assertion of "discrimination" is insufficient to "put the employer on notice that [his] complaint was based on . . . sexual discrimination."  *See Harris-Childs*, 169 F. App'x at 916; *see also Brown*, 406 F. App'x at 840.

Plaintiff argues that the Court should overlook the lack of specificity in his complaint to Degner because Degner allegedly interrupted Plaintiff in the middle of his complaint and directed him to contact Deary in human resources.  *See* Pl.'s Resp. 21.  This argument fails for two reasons.  First, on the morning of December 4, 2013 – *i.e.*, the morning *after* Plaintiff allegedly raised the issue of "discrimination" in a phone call with Degner – Plaintiff sent Degner a long and detailed email taking "full responsibility for [his] actions" and addressing "each of [the] violations [that he was] being reprimanded for."  *See* Degner Email.  In this email, Plaintiff addresses several of the disciplinary reports issued against him, but never once mentions Santos's conduct, or makes any other references to unlawful discrimination or sexual harassment.  *See id.*  Plaintiff's communication with Degner after their December 3, 2013, telephone conversation undermines Plaintiff's contention that he was unable to find a forum for his discrimination complaint.

Second, Plaintiff's report was not "squelched," *see* Pl.'s Resp. 21, because Plaintiff ultimately did exactly what Degner told him to do – that is, he called Deary in Defendants' human resources department to discuss his "discrimination" complaint.  *See* Pinedo Dep. 31:1-5. Indeed, according to Plaintiff, this phone call represents the second interaction that triggered Title VII's anti-retaliation provision.  *See* Pl.'s Resp. 21.  However, as with Plaintiff's earlier conversation with Degner, Plaintiff did not provide Deary with any of the details underlying his complaint, *see* Pinedo Dep. 38:13-23, and instead "just informed [Deary] that [he] felt . . . discriminated against."  *Id.* at 33:22-23.  Additionally, when Deary invited Plaintiff to expand upon his allegation in a written statement, he elected not to.  *Id.* at 33:13-19.[9]  Under these circumstances, Plaintiff's bare assertions of potential discrimination were simply too vague to support a Title VII retaliation claim.  *See Brown*, 406 F. App'x at 840; *Harris-Childs*, 169 F. App'x at 916; *see also El-Bawab v. Jackson State Univ.*, Civil Action No. 3:11CV553-DPJ-FKB, 2013 WL 3884128, at *9 (S.D. Miss. July 26, 2013) (holding that an employee's grievance complaining of "discriminatory treatment" was insufficient under Title VII because it "it never suggested that the alleged discrimination was based on a protected characteristic"); *E.E.O.C. v. Omni Hotels Mgmt. Corp.*, 516 F. Supp. 2d 678, 705 (N.D. Tex. 2007) ("Vague concerns and even vague assertions of discrimination are not sufficient to constitute an opposition to an unlawful employment practice.") (collecting cases).

Finally, Plaintiff's contention that the Fifth Circuit's so-called "good faith" rule somehow renders his general complaints of discrimination actionable under Title VII is without merit.  *See*

---

[9] Plaintiff attempts to use this fact to his advantage by arguing that, like Degner, Deary cut-off Plaintiff's oral complaint of discrimination by insisting that Plaintiff memorialize his complaint in writing.  *See* Pl.'s Resp. 21; *see also* Pl.'s Reply 10-12.  However, unlike Plaintiff's testimony regarding the Degner phone call, there is no evidence that Deary inhibited Plaintiff's ability to give a full accounting of the "discrimination."  Indeed, Plaintiff testified that Deary simply "asked [Plaintiff] to give her a report or write a report of the incidents that happened."  Pinedo Dep. 33:13-17.

Pl.'s Resp. 21. The "good faith" rule to which Plaintiff refers stands for the proposition that an employee's retaliation claim will not be dismissed simply because the employee complained of conduct that he reasonably, but mistakenly, believed was prohibited under Title VII. *See, e.g.*, *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000). It does not, as Plaintiff claims, stand for the proposition that "it is of no difference whether a plaintiff specifies a complaint sufficiently to clearly allege an unlawful employment practice under Title VII to constitute protected activity." *See* Pl.'s Resp. 21. Here, Plaintiff may have had a reasonable good faith belief that Santos's conduct violated Title VII. However, because Plaintiff never sufficiently communicated the discrimination to his employer, he never engaged in a protected activity, and therefore cannot sustain a claim for retaliation as a matter of law. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007) (affirming district court's grant of summary judgment in favor of the employer where the plaintiff failed to establish that she engaged in a protected activity under Title VII).

Because the Court agrees with Defendants that Plaintiff failed to establish the first element of his prima facie case, the Court need not proceed any further in its analysis of Plaintiff's retaliation claim. *See, e.g.*, *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) ("Summary judgment is appropriate if the plaintiff cannot support all three elements [of his prima facie case].");
*Turner*, 476 F.3d at 349.

### 2.    Plaintiff's Title VII sex discrimination claim

The Court next discusses Plaintiff's remaining claim for same-sex harassment.[10]  Title

---

[10] Somewhat cryptically, Plaintiff argues in his response that Defendants "chose not to move for summary judgment on [Plaintiff's] claim for discrimination for having engaged in protected conduct, i.e. he was treated differently in terms of discipline, and terminated, when other employees had engaged in similar or worse conduct and were not disciplined or terminated." *See* Pl.'s Resp. 28-29. The Court shares Defendants' confusion as to precisely what claim Plaintiff believes exists on the basis of these allegations outside of his claims for sex harassment and retaliation. *See* Defs.' Reply 10. Indeed, while the fact that Plaintiff may have been treated less favorably in terms of discipline than his non-complaining co-workers may be some *evidence* of pretext in support of his retaliation

VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *See* 42 U.S.C. § 2000e-2(a)(1). "Sexual harassment is a form of discriminatory treatment, and applies in any situation where there is discrimination 'because of' sex." *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 188 (5th Cir. 2012).

It is well settled that same-sex harassment is actionable under Title VII. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). To assess the validity of a same-sex harassment claim, courts in this circuit follow a two-step inquiry. *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc). "First, [courts] consider whether the alleged conduct was sex discrimination and, second, [courts] evaluate whether the conduct meets the standard for a *quid pro quo* or hostile-work-environment claim." *Id.*; *see also Love v. Motiva Enters. LLC*, 349 F. App'x 900, 902 (5th Cir. 2009). "[J]udicial inquiry into the question [of] whether a given instance of harassment constitutes sex-based discrimination is entirely separate from inquiry into whether the harasser's conduct was serious enough to constitute either *quid pro quo* or hostile environment harassment." *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002).

Consistent with this analytical framework, the Court begins its analysis with the question of whether there is sufficient evidence in the record upon which a reasonable jury could conclude that Santos's alleged conduct was "because of" sex. *See, e.g.*, *Cherry*, 668 F.3d at 188.

### a.    Discrimination "because of" sex

Defendants contend that they are entitled to summary judgment on Plaintiff's same-sex harassment claim because "Plaintiff knew Mr. Santos was married and did not necessarily

---

claim, the Court's research revealed no case – and Plaintiff cites none – suggesting that it constitutes a separate cause of action. Accordingly, the Court rejects Plaintiff's argument that a third claim exists in this Case outside of Plaintiff's claims for sex harassment and retaliation.

believe that Mr. Santos was homosexual." Defs.' Mot. 12. Plaintiff counters that the record

provides ample proof that "Santos's conduct amounted to sexual interest in" Plaintiff. Pl.'s

Resp. 14.

The Fifth Circuit has interpreted the Supreme Court's decision in *Oncale* as "chart[ing]

three evidentiary paths" for employees to prove that harassment in the same-sex context is

"because of" sex:

> (1) [A] plaintiff may show that the harasser was homosexual and
> motivated by sexual desire; (2) a plaintiff may show that the
> harassment was framed 'in such sex-specific and derogatory terms
> . . . as to make it clear that the harasser was motivated by general
> hostility to the presence' of a particular gender in the workplace;
> and (3) a plaintiff may 'offer direct comparative evidence about
> how the alleged harasser treated members of both sexes in a
> mixed-sex workplace.'

*See Boh Bros.*, 731 F.3d at 455 (citing *Oncale*, 523 U.S. at 80-81).

Although these paths are "illustrative, not exhaustive, in nature," *id.* at 455-56, the parties

largely confine their arguments to the first *Oncale* method. *See* Pl.'s Resp. 12-14; Pl.'s Mot. 12-

14; Pl.'s Reply 4-5; *see also* Defs.' Resp. 9-11; Defs.' Reply 2-4. The Court does the same,

focusing on whether a jury could reasonably conclude from the evidence in the record that

Santos is homosexual and was motivated by sexual desire. *See Boh Bros.*, 731 F.3d at 455;

*Oncale*, 523 U.S. at 80.

The Fifth Circuit has provided district courts with two examples of proof that constitutes

"'credible evidence that the harasser was homosexual.'" *La Day*, 302 F.3d at 478 (citing *Oncale*,

523 U.S. at 80). First a plaintiff could introduce "evidence suggesting that the harasser intended

to have some kind of sexual contact with the plaintiff rather than merely to humiliate him for

reasons unrelated to sexual interest." *Id.* at 480. And second, a plaintiff could provide "proof

that the alleged harasser made same-sex sexual advances to others, especially to other

employees." *Id.* Here, the record contains no facts suggesting that Santos ever made sexual advances to other male employees at the River Yard Facility. However, for the reasons that follow, the Court finds that there is evidence that Santos's conduct was motivated by sexual desire.

According to Plaintiff, Santos made "sexual references," "sexual gestures," and sexual propositions toward him on a "daily basis." *See* Pinedo Dep. 21:2-9, 22:1-22. These references included Santos telling Plaintiff that he wanted to see him "fuck," *id.* at 23:1-9, and asking Plaintiff if he wanted to "come play with [Santos's] penis." *Id.* at 22:6-22. Santos allegedly made these comments in a "serious tone" that was not indicative of "a person that's joking around." *Id.* at 21:18-19; *see also id.* at 23:1-7. Plaintiff corroborates this evidence with an affidavit from one of his former co-workers, who states that he observed much of Santos's conduct first-hand. *See* Castaneda Aff. ¶ 6.

While these comments and gestures alone create a fact issue as to whether Santos intended to have sexual contact with Plaintiff, the Court further observes that there is also evidence that Santos repeatedly threatened Plaintiff with rape. *See id.*; Pinedo Dep. 22:3-4. Defendants attempt to marginalize this evidence by arguing that Santos never acted on his threats or even physically touched Plaintiff. *See* Defs.' Resp. 10. That argument fails: rape necessarily involves some form of sexual contact, and serious threats of the same are consistent with the inference that a harasser's conduct was motivated, at least in part, by sexual desire. *See, e.g.*, *Oncale*, 523 U.S. at 77, 82 (recognizing a potential claim for same-sex harassment where one of the alleged harassers threatened the plaintiff with rape). Considering Plaintiff's evidence in its totality – the repeated threats of rape, the invitation for Plaintiff to play with Santos's penis, and Santos's professed interest in observing Plaintiff engage in sexual intercourse – the Court is of

the opinion that a fact issue exists as to whether Santos is homosexual, and whether Santos's alleged conduct towards Plaintiff was "because of" sex.

In reaching this conclusion, the Court readily acknowledges that there is countervailing evidence suggesting that Santos's treatment towards Plaintiff was not motivated by sexual desire. Most notably, Santos's derogatory references to Plaintiff as a "joto" and a "marica" could evince a bias *against* homosexuality.  To the extent Santos believed that Plaintiff was homosexual, such comments could provide an alternative explanation for Santos's conduct.  Still, the Court notes that such anti-gay bias does not foreclose the possibility that Santos himself is homosexual. Moreover, this Court cannot weigh evidence in the context of a summary judgment motion. *See Man Roland, Inc.*, 438 F.3d at 478.  Thus, while it is "of course possible that [Santos] was simply mocking [Plaintiff]," "[a] fact finder ultimately will have to decide which side has the greater weight of the evidence."  *La Day*, 302 F.3d at 480.

Finally, the Court observes that even if Santos was not motivated by sexual desire, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."  *Oncale*, 523 U.S. at 80.  The Fifth Circuit recently joined numerous other federal courts of appeal in holding that a plaintiff bringing a same-sex harassment claim may "satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes."  *See Boh Bros.*, 731 F.3d at 454; *see also id.* at 456 n.7 (collecting cases).  Here, although Plaintiff focused his because-of-sex argument on Santos's sexually charged comments and gestures, it bears noting that a jury could reasonably conclude from Santos's "joto" and "marica" remarks that Santos disliked Plaintiff because he failed to conform to Santos's stereotyped expectations of masculinity.  Under *Boh Brothers*, this conclusion would be consistent with a finding that

19

Santos's conduct towards Plaintiff was "because of" sex. *Id.* at 457 n.12 (observing that a harasser's continuous use of sex-based epithets like "faggot," "pussy," and "princess," "lend themselves to a reasonable inference on the part of the jury that [the harasser] viewed [the plaintiff] as insufficiently masculine").

      **b.**        **Severe or pervasive harassment**

Having concluded that a fact issue exists as to whether Santos's conduct constituted sex discrimination, the Court next considers whether Plaintiff's evidence meets the standard for a hostile work environment claim.[11]   Defendants characterize Plaintiff's evidence as only "minor and unsubstantiated incidents of harassment" consisting, "at the very worst, [of] coarse language and banter by a male counterpart."  *See* Defs.' Mot. 13-14.  Plaintiff responds that Santos's conduct was more pervasive, and at least as severe, as the conduct that the Fifth Circuit found actionable in *Boh Brothers*.  *See* Pl.'s Resp. 15-17.

"Once sex discrimination has been proven sufficiently to survive summary judgment, . . . there is no distinction between same-sex and opposite-sex harassment with respect to the next stage of the inquiry: determining whether the discriminatory action was serious enough to constitute *quid pro quo* or hostile environment harassment."  *La Day*, 302 F.3d at 481.  In this vein, "[s]exual harassment is actionable under Title VII only if the harassing conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Cherry*, 668 F.3d at 188.  To determine whether harassing conduct is severe or pervasive, courts should consider "'all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonabl[y] interferes with an

---

[11] Plaintiff does not make any allegations of *quid pro quo* harassment in the Case.  *See* Pl.'s Resp. 15-17; *see also* Defs.' Mot. 12 n.5.

employee's work performance.'" *Id.* at 188-89 (quoting *La Day*, 302 F.3d at 482). "In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81.

As noted above, Plaintiff cites extensively to the Fifth Circuit's decision in *Boh Brothers* to support his argument that Santos's conduct constituted severe and pervasive sex harassment. *See* Pl.'s Resp. 15-17. In *Boh Brothers*, the Fifth Circuit, sitting en banc, was called upon to review the propriety of a jury's verdict in favor of the employee in a same-sex harassment case. 731 F.3d at 449. There, the plaintiff contended that his supervisor subjected him to almost-daily verbal and physical harassment while working on an all-male construction crew. *Id.* In particular, the plaintiff introduced evidence that his supervisor engaged in the following instances of harassment: (1) referring to plaintiff by terms such as "pussy," "princess," "queer," and "faggot" often two or three times per day; (2) humping plaintiff's backside about two or three times per week while plaintiff was bent over to perform a task; (3) exposing his penis to plaintiff "about ten times" while urinating; and (4) suggesting on one occasion that if plaintiff was not careful, he would put his penis in the plaintiff's mouth. *See id.* at 449-50. Ultimately, the Fifth Circuit held that this evidence collectively supported the jury's finding that the supervisor's conduct was sufficiently severe or pervasive to alter the terms and conditions of the plaintiff's employment. *Id.* at 461.

While the Court does not go as far as Plaintiff in claiming that Santos's conduct is "more severe" and "all-round more pervasive" than that in *Boh Brothers*, *see* Pl.'s Resp. 16, it does find that there are factual similarities between the two cases that ultimately counsel this Court against granting Defendants' Motion. Indeed, like the supervisor in *Boh Brothers*, Santos allegedly "hurled raw sex-based epithets uniquely at [Plaintiff] two-to-three times a day, almost every day,

21

for months on end." *See Boh Bros.*, 731 F.3d at 461.  In addition, both cases involve a pattern of sexually threatening behavior – in *Boh Brothers*, the repeated instances of simulated anal sex, and in this Case, Santos's continuous threats of rape.

Defendants attempt to distinguish *Boh Brothers* by observing that the plaintiff in that case endured "continuous and frequent sexualized acts," not just the "sexual references, tone, and sexual gestures" that Defendants claim typify the instant case.  *See* Defs.' Reply 5.  While the Court is of the opinion that Defendants grossly mischaracterize the extent of Plaintiff's harassment allegations, it is true that there is no evidence that Santos ever physically touched Plaintiff.  Nevertheless, Title VII does not require employees to endure physical contact or harm to establish a hostile work environment claim.  *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 403 (5th Cir. 2013) ("[W]e have held previously that a reasonable jury could find that coworkers created a hostile work environment despite having no physical contact with the plaintiff."); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) ("[V]erbal conduct alone can be the basis of a successful hostile work environment claim."); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (noting that the standard for a hostile work environment "is not, and by its nature cannot be, a mathematically precise test").

To the contrary, numerous courts, including the Fifth Circuit, have sustained hostile work environment claims based solely upon evidence that the plaintiffs were the victims of severe or pervasive verbal harassment.  *See, e.g.*, *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400-01 (5th Cir. 2007) (reversing district court's grant of summary judgment on the plaintiff's hostile work environment claim where the plaintiff was consistently called "Taliban" and "Arab" by his co-workers for a period of a year); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 248-49, 252 (6th Cir. 1998) (reversing district court's grant of summary judgment where the female

plaintiff presented evidence that her male supervisor made ongoing sexual and derogatory gender-based remarks in her presence for a period of seven years, even though only one of the remarks was directed at the plaintiff in particular); *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (holding that there was "substantial evidence" to support the jury's verdict of a hostile work environment where the plaintiff introduced evidence that her harasser made sexually offensive inquiries and comments about her personal life two or three times per week for a period of nearly six months); *Ellsworth v. Pot Luck Enters., Inc.*, 624 F. Supp. 2d 868, 879-80 (M.D. Tenn. 2009) (sustaining male plaintiff's hostile work environment claim at summary judgment stage where evidence established that three of the plaintiff's male co-workers propositioned him for sex six to eight times over a six-month period).

Consistent with this authority, and considering the record evidence in its totality, the Court is of the opinion that a reasonable jury could conclude that Santos's alleged conduct was so severe and/or pervasive that it altered the terms and conditions of Plaintiff's employment. *See Boh Bros.*, 731 F.3d at 461; *Farpella-Crosby*, 97 F.3d at 806.

### c. Defendants' liability

While genuine issues of material fact exist regarding the first two elements of Plaintiff's hostile work environment claim, the Court must still consider whether Defendants can be held liable for Santos's conduct. If Defendants cannot be held liable as a matter of law, then Plaintiff's hostile work environment claim fails. *See Cherry*, 668 F.3d at 189; *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434, 437 (5th Cir. 2005).

Defendants contend that they cannot be held liable for Santos's conduct because "Plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided by Defendants" by failing to report the sexual harassment. Defs.' Mot. 16; *see also*

Defs.' Reply 5-6.  Plaintiff argues that Defendants had actual knowledge of his allegations because he reported "discrimination" over the phone to both Degner and Deary prior to his termination.  *See* Pl.'s Mot. 16-17. Plaintiff further contends that even if Defendants did not have actual knowledge of his complaints, Santos's harassment was so open and pervasive that a reasonable jury could conclude that Defendants possessed constructive knowledge of Santos's conduct.  *See* Pl.'s Reply 7-8, 10.

As the United States Supreme Court has observed, the standard for determining an employer's liability for the sexual harassment of one of its employees depends upon the status of the alleged harasser.  *See Vance v. Ball State Univ.*, --- U.S. ----, 133 S. Ct. 2434, 2439 (2013). For example, if the harasser is the plaintiff's supervisor, and the harassment culminates in a tangible employment action, the employer is strictly liable.  *See id.* at 2439, 2442.  If, however, the harassment does not involve a tangible employment action, the employer can avoid liability if it establishes the following two elements of an affirmative defense:  "(1) [that] the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  *Id.* at 2439 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

In situations in which the alleged harasser is the victim's co-worker, however, "different rules apply."  *Id.*  Specifically, "the employer is liable only if it was negligent in controlling working conditions."  *Id.*; *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012) (noting that to establish a prima facie case of co-worker harassment, the plaintiff must ultimately prove that "the employer knew or should have known of the harassment yet failed to address it promptly").

After some initial disagreement,[12] the parties eventually appear to agree that the co-worker standard is the appropriate framework to evaluate Defendants' liability.[13]  Thus, to establish the final element of his prima facie case, Plaintiff must introduce evidence that Defendants "knew or should have known of the harassment yet failed to address it promptly." See Hernandez, 670 F.3d at 654.

Whether Plaintiff has met his burden of establishing a genuine issue of material fact on Defendants' liability is a close question.  Indeed, as the Court noted in its analysis of Plaintiff's retaliation claim, Plaintiff never reported Santos's conduct to Ozuna or any other representative at Defendants' corporate offices, see Pinedo Dep. 30:6-10, and his generalized complaints of "discrimination" were insufficient as a matter of law to apprise Defendants of the nature and extent of Santos's harassment.  Nevertheless, because there is evidence in the record supporting an inference that Defendants were on constructive notice of Santos's conduct, the issue of Defendants' liability is ultimately one for the jury to determine at trial.[14]

---

[12] While Plaintiff has consistently assumed that the co-worker harassment standard is applicable to the Case, see Pl.'s Mot. 16-17; Pl.'s Reply 7-9, Defendants initially cast their argument in the context of the Ellerth-Faragher affirmative defense.  See Defs.' Mot. 15-17.  However, once Plaintiff correctly noted in his response that this defense is only available in cases in which the harasser is also the employee's supervisor, see Pl.'s Resp. 17, Defendants argued that they were entitled to summary judgment under the "less stringent" co-worker harassment standard.  See Defs.' Reply 5-6.

[13] Though neither party raises this issue in their briefing, the Court observes that other district courts have modified the co-worker standard to account for the "unique factual twist" that may be present in the instant case – namely, where a subordinate employee is accused of harassing his or her supervisor.  See, e.g., Lyles v. D.C., 17 F. Supp. 3d 59, 70 (D.D.C. 2014); see also generally Ann Carey Juliano, Harassing Women with Power: The Case for Including Contra-Power Harassment Within Title VII, 87 B.U. L. Rev. 491 (2007).  Here, because it is unclear whether Plaintiff would even be considered Santos's supervisor under the law, see Vance, 133 S. Ct. at 2439, 2448; Lyles, 17 F. Supp. 3d at 70-71, and because neither party raises the issue for the Court's consideration, the Court assumes for the purposes of this Case that Plaintiff need only prove "negligence" to establish Defendants' liability for Santos's conduct.

[14] The Court also notes that there is at least some evidence that Ozuna, Plaintiff's supervisor, had actual notice of Santos's conduct.  Although Plaintiff testified that Ozuna was never physically present to overhear Santos's lewd remarks and sexual gestures, see Pinedo Dep. 30:16-18, one of Plaintiff's co-workers stated in a sworn affidavit that Ozuna overheard many of Santos's remarks and "would laugh when [Santos] made those comments to [Plaintiff]." See Castaneda Aff. ¶¶ 7-8.  Because the Court finds that a fact issue exists as to whether Defendants had constructive knowledge of Santos's conduct, the Court does not reach the issue of whether Castaneda's Affidavit is

The Fifth Circuit has held that an employer is on constructive notice of sexual harassment if "the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its corporate eyes." *Sharp v. City of Hous.*, 164 F.3d 923, 930 (5th Cir. 1999). "To impute constructive knowledge to the employer, [the jury] must find constructive knowledge on the part of someone whose actual knowledge also would impute knowledge to the employer." *Id.* "In the context of sexual harassment, such persons are those with remedial power over the harasser." *Id.* "Whether an employer may be charged with constructive knowledge is, within certain legal constraints, a question of fact." *Id.*

Here, there is evidence upon which a reasonable jury could infer that Defendants would have known about Santos's harassment "had [they] but opened [their] corporate eyes." *See id.* Plaintiff testified that the harassment occured on a daily basis over a period of several months. Pinedo Dep. 21:2-9, 27:7-9. In addition to the daily verbal comments, gestures, and threats, Plaintiff's co-workers allegedly drew caricatures on a dry-erase board of Plaintiff being sodomized by Santos "that were noticeable to anyone and everyone in the office." Castaneda Aff. ¶ 10. Moreover, Ozuna – as Plaintiff's supervisor – allegedly contributed to the sexually charged work environment by giving the employees at the River Yard Facility permission to post naked pictures on the walls of their work space. *Id.* ¶¶ 11-12. Though Ozuna was tasked with managing other work sites in addition to the River Yard Facility, *see* Pinedo Dep. 51:12-16, it "would be absurd to allow an employer to insulate itself from liability simply by isolating its units from management." *Sharp*, 164 F.3d at 931.

In sum, given the open and pervasive nature of Santos's harassment, a reasonable jury could find that Defendants were negligent in controlling working conditions, and therefore directly liable for Santos's sexual harassment. *See id.* at 930-32; *see also Waltman v. Int'l Paper*

sufficient to establish actual notice on behalf of Defendants.

*Co.*, 875 F.2d 468, 478 (5th Cir. 1989) (holding that a jury could reasonably infer that an employer was on constructive notice of sexual harassment where the plaintiff testified that there was sexual graffiti directed at her in numerous locations throughout the office). As a result, Defendants' Motion is denied as to Plaintiff's claim for sexual harassment.

### 3. Plaintiff's TCHRA claims

Although Plaintiff never specifies whether his claims arise under Title VII, the TCHRA, or both, *see* Am. Pet., Defendants assume that Plaintiff's claims arise under both statutes. *See* Defs.' Mot. 4, 15. As a result, the Court draws the same assumption.

It is well settled that "the law governing claims under the TCHRA and Title VII is identical." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403-04 n.2 (5th Cir. 1999); *see also Prewitt v. Cont'l Auto.*, 927 F. Supp. 2d 435, 452 (W.D. Tex. 2013) ("The analysis of a claim under the TCHRA is identical to that under Title VII, upon which the TCHRA's provisions are modeled."). Accordingly, for all the reasons set forth above, the Court grants Defendants' Motion as to Plaintiff's TCHRA retaliation claim, but denies Defendants' Motion as to Plaintiff's TCHRA claim for sex harassment. *See Shackelford*, 190 F.3d at 403-04 n.2; *see also Prewitt*, 927 F. Supp. 2d at 452.

### 4. Alliance's argument that it has been "improperly named"

Having now addressed all of Plaintiff's claims, the Court next turns to Alliance's contention that "it has been improperly named" in the Case. *See* Defs.' Mot. 5 n.1. In particular, Alliance contends that it "was not Plaintiff's employer and therefore . . . cannot be sued in the capacity in which it has been sued." *Id.* While it is unclear whether Alliance is actually seeking summary judgment on this basis, to the extent that it is, Alliance's request is denied: Alliance has presented no evidence supporting its contention that it was not Plaintiff's employer. Indeed,

the only evidence that even arguably supports Alliance's argument is an affidavit from Genovie

Meza, a human resources generalist at Alliance.  *See* Decl. of Genovie Meza, Ex. C to Defs.'

App. to Resp. to Pl.'s Am. Mot. for Summ. J. and Mem. in Supp., ECF No. 33-1.  While Ms.

Meza states that AutoComm was "the entity for whom Plaintiff worked," *see id.* ¶ 2, she does

*not* state, as Defendants appear to suggest, that Plaintiff was never employed by Alliance.  *See id.*

Given that the record is replete with references to Alliance, *see, e.g.*, Pinedo Dep. 13:5-17, 17:5-

7, 19:18-22, 20:5-6, 30:6-7, 54:8-10, 70:9-11; *see also* Pinedo Dep. Ex. 4 at 17-20, and given

that Plaintiff's direct supervisor testified at deposition that both he and Plaintiff were employed

by Alliance, *see* Ozuna Dep. 29:8-12, 61:9-12, whether Plaintiff was employed by AutoComm,

Alliance, or both, is an issue that now must be resolved at trial.

### C.    Plaintiff's Motion

Plaintiff filed his own motion for summary judgment regarding his Title VII retaliation

claim, his Title VII sex discrimination claim, and the existence of punitive damages.  *See* Pl.'s

Mot. 5, 11-21.  Plaintiff is not entitled to summary judgment on his retaliation claim because, as

set out above, he did not engage in a protected activity as a matter of law.  Plaintiff is not entitled

to summary judgment on his sex discrimination claim because numerous fact issues exist on

every element of his prima facie case, including whether any harassment even took place in the

first instance.  *See* Defs.' Resp. to Pl.'s Facts ¶¶ 5-10 (noting that Defendants uncovered no

evidence of sex harassment).  Finally, because the Court cannot say that Defendants are even

liable as a matter of law, Plaintiff is not entitled to summary judgment on the existence of

punitive damages.  *See Boh Bros.*, 731 F.3d at 467; *Cherry*, 668 F.3d at 187.

### III.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following relief:

**IT IS ORDERED** that Defendants' Motion, ECF No. 28, is **GRANTED** in part and **DENIED** in part as follows:

Defendants' Motion is **GRANTED** to the extent it seeks the dismissal of Plaintiff's Title VII and TCHRA retaliation claims.  Defendants' Motion is **DENIED** to the extent it seeks the dismissal of Plaintiff's Title VII and TCHRA hostile work environment claims.

**IT IS FURTHER ORDERED** that Plaintiff's Motion, ECF No. 30, is **DENIED** in its entirety.

**SO ORDERED**

**SIGNED this 14th day of June, 2015.**

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE